IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

RECEIVED

George D. McCarley
      Plaintiff
  v.

CITY OF ROANOKE, et al.
      Defendant

Civil Action No. <u>3:07-CV-311-MHT</u>

## OBJECTION TO ORDER AND RECOMMENDATIONS

The court ordered objections to *order and recommendations* be filed by May 26, 2007. Now, due to the continuing efforts of plaintiff, the original City of Roanoke charges against McCarley are appealed to Randolph County Circuit Court. Venire is scheduled for May 14 with a trial scheduled for May 21, 2007. Given the overloaded Circuit Court docket and the presence of two capital crimes cases, there is a strong possibility McCarley case will be "bumped" until fall term. The problem now is that McCarley must sit around the courthouse awaiting the calling of his case and will not be able to do justice to any objections in 3:06 cv 311 by May 26. Therefore, we respectfully request this court grant an extension of time to file objections, until June 9, 2007.

## <u>THE COURT GRANTED CONTINUANCE UNTIL JUNE 9, 2007.</u>

Several other civil rights violations would occur in the interim between this courts order and the intended trial docket:

    a.   City of Roanoke failed to grant discovery to McCarley on 4 separate instances.
    b.   AG and defendant Troy King awards "Officer of the Year" to a Roanoke Investigator.
    c.   McCarley learns of "Rodney King" style incident in Roanoke (as he warned this court)

At the May 21 "docket call", Circuit Judge Ray Martin was more fully briefed as to the totality of City of Roanoke failure to grant discovery. Following this briefing, Judge solicited a motion for continuance. McCarley advised he would prefer to move forward this week although

1

needing discovery. The judge ordered the matter moved to the October 22 Fall Term and further ordered that discovery be granted to McCarley.

Plaintiff McCarley asks this court to keep in mind he is a true Pro Se and is not an attorney. An attachment at page A18 in *Uboh v. Reno*, 11th Circuit stated "(2) Uboh's Pro Se complaint, which we are bound to construe liberally" – and same liberal basis should be accorded to McCarley.

An added difficulty of this case for both the court and Plaintiff is the large size and extensive time period of the case. The large number of people charged poses difficulty in delivering this court a manageable document of charges. The lengthy time period poses added difficulty. There are possibly three[1] distinct cases encompassed by the McCarley Civil Rights construction. Even within three separate filings, there would be extensive difficulty in providing all the documentation required by a court. The present construction offers the court clear economies of both process and docket. *Heightened Pleading Standard* becomes an issue of concern with any method of constructing this case. It is likely that a full pleading constructed for each and every individual (clearly required) will go to the length of a Tom Clancy[2] novel. Plaintiff expected this extensive burden to be required at some later stage of the proceedings. If the court wishes a *heightened pleading* at this point, then Plaintiff should be allowed to Amend his pleading to provide the Rule 9 requirement. We lastly direct this courts attention to the SCOTUS case of *Charlene Leatherman* in which Chief Justice Rehnquist (1993) rejects the heightened pleading standard on appeal and reverse Fifth Circuit in process (page A23 paragraph 2).

McCarley advises this court of the necessity of reading the cases and not to rely upon the very brief case citations provided by USCA. McCarley's full reading of the cases cited has provided a wealth of documentation that has the full effect of STRENGTHENING the McCarley complaint.

---

[1] One case would be against the City and State; a second case could be lodged against the Tax Department; a third case could be lodged against the Real Estate operation and their legal adviers.

The extensive addendum herein represents the key paragraphs of the cases identified by the court. There are surprises in store as the court reads through the remainder of this objection, and it is hoped those surprises will cause the court to move forward with service of process.

The broad and general objections outlined in paragraphs 2 through 13 will serve as a general discussion of McCarley objections, while the points following 13 will represent a point by point rebuttal of the courts ORDER AND RECOMMENDATION.

As a direct result of the extended case reading provided by this court, McCarley is able to outline a broad and general "test" of key parameters required of §§1983-1986 construction:

a. Rights granted by the United States Constitution must have been violated
b. Customs[3] of local officials should be involved to avoid "immunity" defense
c. Jurisdiction[4] must be violated by Judges to avoid "immunity" defense
d. Authority must be intentionally[5] violated by Prosecutors to avoid "immunity" defense
e. Knowledge[6] of violations or conditions must be held by defendants to avoid "immunity"
f. Overt acts should be present
g. A "meeting of the minds" must be present (absent overt acts)
h. Deliberate conduct on the part of City or controlling institution (A9, para 2)
i. Evidence of failure to act in "prevention"[7] may be indictable over and above immunity.

All these points plus others are present and documented in the McCarley complaint.

2.    The totality of immunity[8] suggested by this court in response to *McCarley* is so onerous that it leads to the conclusion that any and all governmental operations and their personnel are fully immune from prosecution. The many public domain studies indicating the size of government equal to as much as 40% of our population and/or total economy suggest that no such grant of immunity can possibly be extended, while protecting our constitution and rights. While the many cases cited in 42 USC 1985 are meritorious on individual case basis, the totality of those cases simply destroys

---

[2] The Court noted the Five page chronology from previous submittals. This should provide a glimpse of the extreme requirement posed by heightened pleading standard.
[3] Monell, page A5, Line 1.
[4] *Simmons v. Conger*
[5] Deliberate conduct per *Board of County Commissioners of Bryan Co., Oklahoma v. Jill Brown*
[6] Case of *Snow v. Citronelle* at A 18.
[7] See Treatise at page A3

the precious protections of the United States Constitution and further, fully destroys the protections called civil rights, and has no appropriate application to McCarley, as McCarley invokes 1st, 5th, 6th, 14th Amendments and the many cases quoted that deal with Civil Rights only appear to invoke 8th and 14th Amendments. While it was our *founding fathers* who first granted judicial immunity, that grant was conditioned by *Blackstone,* who stated many concerns related to any immunity beyond judicial. Original immunity was granted only to Supreme Court of the United States.

3. Construction of the *McCarley* complaint was closely influenced by *AmJur Trials*, the Model Trial for Police Misconduct. That model trial is conditioned and influenced by over 25 successful civil rights prosecutions, with some going to Supreme Court of the United States. The many briefs included are careful to discuss the points raised by this court in the dismissal order. There is serious conflict between the interpretation of this court and that of AmJur.

4. Totality of immunity suggested by this court violates the most precious intent of the United States Constitution and we will object on that basis.

5. Totality of immunity suggested by this court violates the most precious intent of Civil Rights legislation, to include the original Bill of Rights. All Americans are granted civil rights by our constitution. These rights were "dubbed" civil rights as the result of issues of the past hundred years. Therefore, any suggestion that "*race based animus*" must be present[9], very plainly opines contrary to the blood of tens of millions of Americans shed in protection of these rights since 1776. Race based animus can only be a factor in narrowly defined cases. To invoke any raced based factors thus limiting the reach of the civil rights granted to all Americans is yet another restriction on the intent of the founders in their drafting of our constitution.

6. The courts order has the duplicative effect of declaring *due process* to be dead. We will argue that if all governmental entities and courts are granted immunity as this court infers from

---

[8] The Scotus cases *Monell* and *Pierson* are the most quoted dealing with *Respondeat Superior* and/or *Immunity.*

cases cited, then they are free to destroy the tenets of due process at their leisure. This also destroys any and all intent of the founding fathers as regards the *natural rights of man* and *common law.*

7.    The very same §1985 case citations quoted by this court on "immunity" also contains case citations declaring that *"liberal constructions be granted to pro se"* petitioners. There appears no liberal construction in this courts consideration and order.

8.    AmJur Model Trial, along with many §1985 case citations make it clear that those granted the immunity indicated by this court are not granted immunity in their capacity as private citizens, nor are they granted immunity if they violate certain tests that will be elaborated herein.

9.    The courts order fails to address specifically the complaints related to *constitutional amendments.* We will specifically address *the 6th amendment* complaint. The right to *Trial by Jury* was cited[10] by the founding fathers as the second most important right to that of electing your representatives. *Habeas Corpus* being the 3rd most important right in their minds. (a) McCarley complaint specifically cited Alabama statutes that forbid municipalities to hold jury trials. Therefore by simple definition of statute, Alabama municipalities have no right of arrest. (b) Unless those arrested are immediately taken before a cognizant *magistrate* and then bound to a court of proper jurisdiction, that arrest is in full violation of the most basic tenets of law. (c) This court cited a municipal ordnance enacted to invoke all Alabama statutes as being "fair game" in Roanoke court. We will argue that such ordnance is fully unconstitutional as it ignores any and all tenets of the Alabama and United States Constitution. No one can enact such ordnance by virtue of the legal theory contained in the *10th amendment.* Because the constitution was in place FIRST, that constitution is the governing force until such time as it is amended appropriately in keeping with respective *rules of amendment.* It will be necessary to strike down the *Right to Trial by Jury* before

---

[9] Discussion of cases will highlight a SCOTUS discussion of the word "perhaps" at page A13, line 2.
[10] See addendum to original case 663 complaint entitled, "Address to Inhabitants of Quebec"

the Roanoke ordnance has any binding constitutional effect. Both 663 original complaint and the present construction outline the Alabama Code required to arrive at the conclusion above.

10.    The courts surprising recommendation comes at a time when plaintiff has gained several new abilities to establish a *"meeting of the minds"* as required by §1985. While the many overt acts detailed in complaint appear to satisfy the "brief" provided by AmJur model trials, the heightened information available will make this case a "slam dunk" at trial. The sheer weight of evidence of Overt acts being supported by strong testimony of "meeting of the minds" is specifically what §1983 and §1985 were enacted to redress.

11.    The conspirators involved have one goal and one goal only. That is to run McCarley out of town by any means at their disposal. This is the natural response to their being caught violating all too many bodies of law. The courts order therefore plays right into their illegal hand and provides the conspirators this courts blessing of their criminal practices.

12.    §1986 was enacted to penalize those who fail to take action to prevent a violation of civil rights. Perhaps it is time to build that element into an amended complaint.

13.    Lastly, we will argue that at some time, the erosion of constitutional protections must and shall cease. McCarley is a US veteran with service in 4 war zones since leaving military service. McCarley has sworn an oath to "support and defend the constitution against all enemies . . ." He has found those enemies and prays this court will fulfill its obligation to likewise uphold the constitution.

## OBJECTION AND SPECIFIC REBUTTAL OF ORDER AND RECOMMENDATION

14. Page 2 of O & R discusses actions before Judge Boyd. The major issue with Judge Boyd seemed to be *diversity*, that having been remedied by the updated complaint to include parties in two other states. The second issue identified by Judge Boyd was the construction of two separate complaints. Therefore the present complaint changed the format to a single complaint encompassing both §1983 and §1985. McCarley included other actors as a result of the contribution of those actors

to the ongoing conspiracy. Lastly, as indicated earlier and as will be explored more fully by review of cases cited, Plaintiff objects to the assertions of Judge Boyd and this court that any of the individuals charged hold any immunity whatsoever. All violate many of the "key tests" identified in the opening pages.

The two month delay discussed was a result of this pro se litigant belief that a trial start or award was imminent in another case and he therefore devoted the time to that case while requesting an extension of time from this court.

15. O & R Page 4 suggests for the first time there is no "racial or otherwise class-based invidiously discriminatory animus" present in McCarley complaint. This assertion is and always has been in direct contravention to the United States Constitution as Amended. The court provided the case citation for *Griffin*, and McCarley reproduces same as cited by _Bray v. Alexandria_. In Bray, (first paragraph page A13) SCOTUS Justice Scalia emphasizes the word "perhaps" as being key to a complete understanding and enforcement of this statute. SCOTUS interpretation and discussion make it clear that other issues beyond the racial or discriminatory may invoke this Civil Rights statute. Clearly, "race and discrimination" were not factors in the mind of the Founders while they penned our Constitution. Clearly all people enjoy the protections of Civil Rights enumerated by our Constitution as amended, and we clearly object to the O & R on this basis. While McCarley expressly alleges discrimination based upon other factors, he is clearly within the bounds of construction allowed by, "*perhaps*." The courts footnote in Doc #5, Fn 6 is due to be retracted and reversed due to the reasons listed.

16. O & R Page 5 serves to question the method of charging some but not all defendants and suggests that a private corporate defendant "cannot be held liable under section 1983 on a respondeat superior of vicarious liability basis" further stating defendants must qualify as "state actors". McCarley responds via two cases reproduced in addendum at pages A 15 & A16. _Swan v. Southern_

_Health Partners_ demonstrates a 2003 case in which plaintiff was allowed to charge a private corporation. Further in _Estades-Negroni_, (2004) the court again opines the need to qualify as acting under "color of law". McCarley alleges that those he charged do in fact qualify as state actors by virtue of their having filed a "malicious criminal charge" against him (which was downgraded at an unconstitutional hearing while city clerks refused discovery later ordered by a Circuit Judge), and two, by their illegal act of disposing of foreclosed property while that matter is the continuing issue of case no. 3:06 CV 00091. The private actors own actions in serving as a pawn of the other conspirators and lodging charges while ignoring an ongoing Federal District Court trial fully qualify them as "state actors" in all respects required for this Civil Rights charge.

17. Last paragraph of O & R page 5 contains Courts allegation that; " to prevail on a 1983 malicious prosecution claim, plaintiff must demonstrate that the criminal prosecution giving rise to his injury terminated in his favor." And McCarley responds that in fact, the malicious charge did in fact terminate in his favor. (i) The City hearing was illegal, and, (ii) City hearing denied a jury trial, and (iii) city failed to grant any discovery, depositions, witness lists demanded by McCarley, thus further conspiring to prevent or pervert justice, and (iv) on appeal to Circuit Court, Judge upon being briefed as to these facts did grant Jury Trial, immediately ordered discovery items granted as demanded, and (v) set continuation date until October. It should be clear from the above that the illegally constituted Roanoke Municipal Court hearing dropped the more serious charge and this is clearly an act "terminating in favor of plaintiff."

18. O & R pages 6 & 7, the court suggests the case of _Snow_ (page A 18) proves City of Roanoke (i) cannot be charged on a respondeat superior basis. Plaintiff directs the court to the fact that upon full reading, _Snow_[11] is a case in which a suicide at jail is the issue – raising only 8th and 14th amendment complaint. This should further have been declared a case of wrongful death and not

---

[11] Reproduced at page A 18 with reversal of dismissal of charges against all except City.

a civil rights issue. That court dropped all charges except those against a policeman who was proven to have *knowledge* of the suicidal state of the victim. And now knowledge serves to strengthen the case constructed by McCarley and we thank the court. However, on the point of respondeat superior, we direct the court to the conclusion paragraph reproduced on page A 19, indicating higher federal court in Snow reversed the dismissal of charges against all except the city. We now direct the court to the case summary presented on page A5. In very first paragraph, SCOTUS opines:

> "We held in *Monell* 436 U.S., at 694, that a local government is liable under §1983 for its policies that cause constitutional torts. These policies may be set by the government's lawmakers, "or by those whose edicts or acts may fairly be said to represent official policy."

Moving to page A8, discussion of Monell continues cited by another case:

> "We also recognize that a municipality may not be held liable under §1983 solely because it employs a tortfeasor. Our conclusion rested partly on the language of §1983 itself. In light of the state's imposition of liability on one who "subjects [a person], or causes [that person] to be subjected to a deprivation of federal rights."

We believe the court is in error on this point. As the two cases cited make clear, municipalities have in fact been charged under §1983 and SCOTUS and other courts have upheld those charges.

19. The Court on O & R Page 7 states McCarley failed allege "that any municipal custom or policy caused his injury". We direct the court to the complaint, where on paragraphs 1, 2, and 9, McCarley does in fact allege a failure of "custom". McCarley again reminds the court of his pro se status and the fact he could easily make a mistake in this area. However, he did repeatedly use the word "custom" in his complaint. If on amended complaint using a heightened pleading standard he would be happy to strengthen this area of his pleading.

20. Last paragraph of O & R page 7 now moves to the courts suggested statute of limitations problems. We direct the court to the included discussion of same at page A 19. A great deal of information is contained in the Chronology of events that date back in time some 10 years. By our calculation, the conspiracy first overt act may have come in 1996, but surely commenced in 1999

and has continued forward unabated. The most recent act known to McCarley would occur on May 21, 2007, when McCarley briefed Circuit Judge Martin on city failure to grant discovery. As of the date of this writing, McCarley has not yet been given his points of discovery, and thus the conspiracy continues to march forward. The statue on page A 19 makes it clear the statute does not begin to toll until the date of the last conspiracy. As these events have been unending for several years, the court is well advised that no possible statute of limitations has even begun to be in effect or to toll. An interesting discussion would entertain just what length of statute would apply in this situation. However, we are clearly not near the beginning of a tolling.

21. On O&R page 8, the court suggests McCarley cannot bring charges due to the 11th Amendment. On page A25, we reproduce a citation that applies the case of _Cross_ to the case of _Downing_ (2003). The result was the courts DENIAL of 11th amendment immunity to defendants. We offer the following as added evidence of the RIGHTFULNESS of McCarley complaint and in dispute of 11th amendment immunity:

". . . state statute does not immunize state from employee torts commited in performance of government functions." 15 AmJur Trials §37 page 634

"Eleventh Amendment did not bar §1983 [1985] action, despite claim that defendants were acting in official capacity. Loukaj v. Hofbauer, E.D.Mich 1991 784 F.Supp 377.

We suggest the court is in error on the point of 11th amendment immunity. Supreme Court of the United States holds original jurisdiction in 11th amendment cases. However, our amended heightened pleading will make it clear that all the actors at all levels were knowledgeable of the McCarley problem and complaint in progress and wholly failed to take any action whatsoever. Therfore, there actions are not afforded 11th amendment protections.

22. O & R pages 8 &9 suggest that Judge Holiday and prosecutor Kitchens are automatically granted immunity. We offer the following derived from page A20 and the cases of _Jarallah_ and

*Simmons* in contradiction. As documented by Simmons, Judge Holiday (i) dealt with McCarly personally on several occassons, (ii) Judge Holiday was cleary in violation of his jurisdiction. (iii) He is in violation of jurisdiction by virtue of daring to hear this blatantly malicious case. (iv) He and prosecutor Kitchens are in violation for allowing an uneducated individual to sign warrants. (v) Both Judge and Prosecutor are in violation for failing to insure the system of Roanoke police brought an individual before them upon arrest. (vi) Judge and Prosecutor are guilty of failing to insure the justice system of Roanoke functions constitutionally. (vii) Judge and Prosecutor are guilty of allowing local custom to deprive individuals of constitutional rights, even when higher judicial authority orders discovery or other court matters. (viii) Judge and Prosecutor are guilty of having knowledge of a conspiracy, of participating in that conspiracy, and of failing to prevent same.[12] While they attempted to distance themselves via recusal, they remained in control and simply "handed" a stand-in Judge and Prosecutor a faulty case to deal with. Clearly these individuals should be charged. These are the type violations our Founding Fathers fled in "bloody old England"

## CONCLUSION

We believe we have successfully rebutted the courts concerns as provided in O & R. We believe the court should either ask for an amended complaint (with or without heightened pleading) or else move forward and issue service of process. While some of the issues of the conspiracy are very heavy, the court must understand the impact on a small town. Terrible problems have resulted from the bad practices of these bad actors. Plaintiff has learned of a most serious event in which a police "drug raid" found no drugs, but in process, the police team "tear gased" two infants and the house burned down during the police action. Johnny Cochran of OJ fame agreed to take that case, only to die within weeks. The court may rest assured their action

---

[12] Improved ability to prove this meeting of the minds.

to prosecute this Civil Rights action will have the effect of correcting the many serious violations of law and custom on the part of the City of Roanoke.

Respectfully submitted

*G. McCarley*

George D. McCarley, Pro Se
216B Chestnut Street
Roanoke, Al 36274
334-863-6489

## PROOF OF SERVICE

I, George D. McCarley, do swear or affirm that on this date, June 7, 2007, as required by Supreme Court Rule 29 I have served the enclosed ACTION on each party to the above proceeding or that party's counsel, by depositing envelope containing the above documents in the United States Mail properly addressed to each of them, and with first class postage prepaid, or by delivery to a third party commercial carrier for delivery within 3 calendar days.

The Clerk
Middle District of Alabama, Eastern Division
One Church Street, PO Box 711
Montgomery, Al 36101-0711

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 7, 2007

*G. McCarley*

George D. McCarley

## TREATISES OR AUTHORITIES

A1    Thurgood Marshall Speech on 200th Anniversary of US Constitution, May 6, 1987

A2    Ronald Reagan Remarks at "WE THE PEOPLE" Bicentennial Celebration September 17, 1987, Philadelphia

A3    Section 1983 Municipal Liability and the Doctrine of *Respondeat Superior* Charles A. Rothfeld, University of Chicago Law Review

A4    The Duty to Control the Conduct of Another, Harper and Kime Yale Law Review

## CASE CITED

A8    Board of County Commissioners of Bryan County, Oklahoma v. Jill Brown Supreme Court of the United States, No. 95-1100 (April 28, 1997) (O'Connor for Majority) – (Souter Dissenting)

A21    Charlene Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit

Supreme Court of the U.S. No. 91-1657 (March 3, 1993) (Rehnquist, J.)

A25    Cross V. State of Alabama, 49 F.3d 1490 (11th Cir. 1995)

A25    Downing v. Board of Trustees (UAB) (11th Cir. No. 00-10481) (Feb 13, 2001)
Citing Cross V. State of Alabama

A16    Estades-Negroni v. John Doe (1st Circuit n0. 04-1792) (Citing *Harvey*)

A13    Griffin V. Breckenridge, 403 U.S. 88 (1971)

A16    Harvey v. Harvey, 949 F.2d 1127, 1130 (11th Cir. 1992)

A20    Jarallah v. Simmons, WL 2242794, *2(11th Cir. Aug. 7, 2006)

A13    Jayne Bray v. Alexandria Women's Health Clinic (Supreme Court of the U.S. No. 90-985
Justice Scalia for majority
Justice Stevens dissenting (see his Heightened Pleading Standard discussion)

10     Loukaj v. Hofbauer, E.D.Mich. 1991, 784 F Supp. 377

A5     McMillan v. Monroe County, Alabama  No. 96-542 (June 2, 1997)

A8     Monell v. New York City Dept. of Social Servs. 436 U.S. at 689

A12    Pierson v. Ray, 386 U.S. 547 (1967)

A20    Simmons v. Conger, 86 F.3d 1080, 1084 (11th Cir 1996)

A18    Snow v. City of Citronelle, Al., 420 F.3d 1262, 1270 (11th Cir. 2005)

A15    Swan V. Southern Health Partners (11th Circuit No. 03-14387)

A19    Trawinski v. United Technologies, 313 F.3d 1295 (11th Cir 2002)

A17    Uboh v. Reno, (11th Circuit No. 95-8557)

## ADDITIONAL STATUTORY POINTS

A19    (18 USC ?) § 652 Statute of Limitations for Conspiracy

A24    Federal Rules of Civil Procedure, Rule 9

10     15 AmJur Trials §37 page 634

This speech Thurgood Marshall gave in 1987 was part of the constitutional bicentennial celebration. Politicians and Judges around the country were praising the "founding Fathers" for their genius at writing a document that established the guiding legal principles of the republic for generations. But Marshall was one of the few voices pointing out that the original constitution required numerous amendments and came to a crisis that required a Civil War to solve. In a time of flag waving and patriotic rhetoric, Marshall's comments surprised many and created Front-page headlines.

**Remarks of Thurgood Marshall**
**At The Annual Seminar**
**of the**
**SAN FRANCISCO PATENT AND TRADEMARK LAW ASSOCIATION**
In Maui, Hawaii May 6, 1987

1987 marks the 200th anniversary of the United States Constitution. A Commission has been established to coordinate the celebration. The official meetings, essay contests, and festivities have begun.

The planned commemoration will span three years, and I am told 1987 is "dedicated to the memory of the Founders and the document they drafted in Philadelphia." [1] we are to "recall the achievements of our Founders and the knowledge and experience that inspired them, the nature of the government they established, its origins, its character, and its ends, and the rights and privileges of citizenship, as well as its attendant responsibilities." [2]

Like many anniversary celebrations, the plan for 1987 takes particular events and holds them up as the source of all the very best that has follcwed. Patriotic feelings will surely swell, prompting proud proclamations of the wisdom, foresight, and sense of justice shared by the Framers and reflected in a written document now yellowed with age. This is unfortunatenot the patriotism itself, but the tendency for the celebration to oversimplify, and overlook the many other events that have been instrumental to our achievements as a nation. The focus of this celebration invites a complacent belief that the vision of those who debated and compromised in Philadelphia yielded the "more perfect Union" it is said we now enjoy.

I cannot accept this invitation, for I do not believe that the meaning of the Constitution was forever "fixed" at the Philadelphia Convention. Nor do I find the wisdom, foresight, and sense of justice exhibited by the Framers particularly profound. To the contrary, the government they devised was defective from the start, requiring several amendments, a civil war, and momentous social transformation to attain the system of constitutional government, and its respect for the individual freedoms and human rights, we hold as fundamental today. When contemporary Americans cite "The Constitution," they invoke a concept that is vastly different from what the Framers barely began to construct two centuries ago.

For a sense of the evolving nature of the Constitution we need look no further than the first three words of the document's preamble: "We the People."

———————————————————————

# Remarks at the ``We the People'' Bicentennial Celebration in Philadelphia, Pennsylvania

# September 17, 1987

A 1

*Note: The President spoke at 11:45 a.m. in front of Independence Hall. In his opening remarks, he referred to former Supreme Court Chief Justice Warren E. Burger, Chairman of the Commission on the Bicentennial of the United States Constitution. At the close of the President's remarks, the Centennial Bell was rung.*

All men are created equal and endowed by their Creator with certain inalienable rights -- until that moment some might have said that was just a high-blown sentiment, the dreams of a few philosophers and their hot-headed followers. But could one really construct a government, run a country, with such idealistic notions? But once those ideals took root in living, functioning institutions, once those notions became a nation -- well, then, as I said, the revolution could really begin, not just in America but around the world, a revolution to free man from tyranny of every sort and secure his freedom the only way possible in this world, through the checks and balances and institutions of limited, democratic government.

Checks and balances, limited government -- the genius of our constitutional system is its recognition that no one branch of government alone could be relied on to preserve our freedoms. The great safeguard of our liberty is the totality of the constitutional system, with no one part getting the upper hand. And that's why the judiciary must be independent. And that's why it also must exercise restraint.

If our Constitution has endured, through times perilous as well as prosperous, it has not been simply as a plan of government, no matter how ingenious or inspired that might be. This document that we honor today has always been something more to us, filled with a deeper feeling than one of simple admiration -- a feeling, one might say, more of reverence. One scholar described our Constitution as a kind of covenant. It is a covenant we've made not only with ourselves but with all of mankind. As John Quincy Adams promised, ``Whenever the standard of freedom and independence has been or shall be unfurled, there will be America's heart, her benedictions and her prayers.'' It's a human covenant; yes, and beyond that, a covenant with the Supreme Being to whom our Founding Fathers did constantly appeal for assistance.

**Section 1983 Municipal Liability and the Doctrine of Respondeat Superior**
Charles A. Rothfeld
*The University of Chicago Law Review*, Vol. 46, No. 4 (Summer, 1979), pp. 935-970
doi:10.2307/1599281
This article consists of 36 page(s).

A 2

## Section 1983 Municipal Liability and the Doctrine of Respondeat Superior

Section 1983 of Title 42 of the United States Code,[1] as recently interpreted by the Supreme Court in *Monell v. Department of Social Services*,[2] allows municipalities to be held liable for certain violations of constitutional rights committed by their officers. In so construing the statute, the Court overruled those portions of its earlier decision in *Monroe v. Pape*[3] holding that municipalities cannot constitute "persons" under section 1983. The *Monell* Court, however, stopped short of concluding that municipalities should be held liable for all constitutional violations committed by their officers; it indicated instead that liability should be imposed on municipalities only for violations effected pursuant to "official policy,"[4] and declared that the doctrine of respondeat superior[5] is inapplicable to section 1983 suits against municipalities.

Although the rejection of municipal respondeat superior is likely to become one of the most frequently cited aspects of *Monell*,[6] the Court's discussion of the outer bounds of municipal liability is in no way essential to the *Monell* holding. Since the case involved

---

[1] 42 U.S.C. § 1983 (1976) provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects or causes to be subjected, any citizen of the United States or any other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

[2] 436 U.S. 658 (1978).

[3] 365 U.S. 167 (1961).

[4] 436 U.S. at 694.

[5] The doctrine allows one party to be held liable for another's actions under certain circumstances; the term is generally used, as it is in this comment, to describe its "most familiar illustration . . . the liability of a master for the torts of his servant in the course of his employment." W. PROSSER, HANDBOOK OF THE LAW OF TORTS § 69, at 458 (4th ed. 1971). *See* RESTATEMENT (SECOND) OF AGENCY § 219(1) (1958) [hereinafter cited as RESTATEMENT]. A servant is broadly defined as "a person employed to perform services in the affairs of another and who with respect to the physical conduct in the performance of the services is subject to the other's control or right to control." RESTATEMENT, *supra*, § 220(1). *See* W. PROSSER, *supra*, § 70, at 460. The modern view is that the employer may be held liable even for the employee's intentional torts, so long as they were committed in the course of the servant's employment. *Id.* at 464-67. On the "scope of employment" requirement, see RESTATEMENT, *supra*, §§ 228-237; on the requirement that the employer have "control" over the employee's actions, see *id.* § 220 & Comment d. W. PROSSER, *supra*, § 70, at 460.

[6] *See, e.g.,* Owen v. City of Independence, 589 F.2d 335, 336-37 (8th Cir. 1978), *cert. granted*, 48 U.S.L.W. 3189 (Oct. 2, 1979) (No. 78-1779), Jones v. City of Memphis, 586 F.2d 622, 624-25 (6th Cir. 1978); Kedra v. City of Philadelphia, 454 F. Supp. 652, 677-78 (E.D. Pa. 1978); *The Supreme Court, 1977 Term,* 92 HARV. L. REV. 57, 320 n.52 (1978).

A3

**The Duty to Control the Conduct of Another**
Fowler V. Harper, Posey M. Kime
*The Yale Law Journal*, Vol. 43, No. 6 (Apr., 1934), pp. 886-905
doi:10.2307/791468
This article consists of 20 page(s).

# THE DUTY TO CONTROL THE CONDUCT OF ANOTHER

## FOWLER V. HARPER‡ AND POSEY M. KIME††

### INTRODUCTION

WHETHER a person is under a duty to make any effort to control the conduct of another to avoid harm to a third person presents a problem in the law of Torts which is generally treated as one of affirmative obligation. The distinction between misfeasance and mere non-feasance is an old one and, while the line is recognized as shadowy in places, it still affords a practical basis for analysis. Whether given conduct is to be described as the improper performance of proper acts or a failure to perform acts which should have been performed is the orthodox touchstone for deciding many tort cases.[1] To be sure, this formula is capable of manipulation, and any given set of facts can be compressed to come within the concept of non-feasance or expanded to fit the mould of misfeasance. The trick is a simple one of selecting that point in the series of happenings from which the analysis is to start.[2] An accident at a level crossing, for example, may logically be regarded as the result of the mere failure of the engineer to sound a warning or make timely application of his brakes; or it can be regarded as the improper operation of the locomotive. But although the formula is thus superficial and inexact, the basic principles for determining duty are the same in all cases. A sounder basis for analysis is the relationship of the parties. If the conduct of the actor has brought him into a human relationship with another, of such character that sound social policy requires either some affirmative action or some precaution on his part to avoid harm, the duty to act or take the precaution is imposed by law. "Given a relation," says Judge Cardozo with characteristic insight,[3]

"involving in its existence a duty of care . . . , a tort may result as well from acts of omission as of commission in the fulfillment of the duty thus recognized by law. What we need to know is not so much the conduct to be avoided when the relation and its attendant duty are established as exist-

‡ Professor of Law, Indiana University School of Law, author of A TREATISE ON THE LAW OF TORTS (1933).

†† Judge of the Appellate Court of Indiana.

1. See BOHLEN, STUDIES IN THE LAW OF TORTS (1926) 35.
2. See HARPER, LAW OF TORTS (1933) 304, § 2c.
3. Moch Co., Inc. v. Rensselaer Water Co., 247 N. Y. 160, 167, 159 N. E. 896, 898 (1928).

SUPREME COURT OF THE UNITED STATES

No. 96-542

# WALTER McMILLIAN, PETITIONER *v.* MONROE COUNTY, ALABAMA

## on writ of certiorari to the united states court of appeals for the eleventh circuit

[June 2, 1997]

We held in *Monell*, 436 U. S., at 694, that a local government is liable under §1983 for its policies that cause constitutional torts. These policies may be set by the government's lawmakers, "or by those whose edicts or acts may fairly be said to represent official policy." *Ibid.* A court's task is to "identify those officials or governmental bodies who speak with final policymaking authority for the local governmental actor concerning the action alleged to have caused the particular constitutional or statutory violation at issue." *Jett* v. *Dallas Independent School Dist.*, 491 U.S. 701, 737 (1989). Here, the parties agree that Sheriff Tate has "final policymaking authority" in the area of law enforcement. They sharply disagree, however, about whether Alabama sheriffs are policymakers for the State or for the county when they act in a law enforcement capacity. [n.2]

In deciding this dispute, our inquiry is guided by two principles. First, the question is not whether Sheriff Tate acts for Alabama or Monroe County in some categorical, "all or nothing" manner. Our cases on the liability of local governments under §1983 instruct us to ask whether governmental officials are final policymakers for the local government in a particular area, or on a particular issue. See *Jett*, 491 U. S., at 737 (court must identify "those officials who have the power to make official policy *on a particular issue*" (emphasis added)); *id.*, at 738 (question is whether school district superintendent "possessed final policymaking authority *in the area of* employee transfers" (emphasis added)); *St. Louis* v. *Praprotnik*, 485 U.S. 112, 123 (1988) (plurality opinion) ("[T]he challenged action must have been taken pursuant to a policy adopted by the official or officials responsible under state law for making policy *in that area of* the city's business" (emphasis added)). Thus, we are not seeking to make a characterization of Alabama sheriffs that will hold true for every type of official action they engage in. We simply ask whether Sheriff Tate represents the State or the county when he acts in a law enforcement capacity.

Second, our inquiry is dependent on an analysis of state law. Cf. *Jett, supra*, at 737 (" `[W]hether a particular official has "final policymaking authority" is a question of *state law*' " (quoting, with original emphasis, *Praprotnik, supra*, at 123 (plurality opinion))); *Pembaur* v. *Cincinnati*, 475 U.S. 469, 483 (1986) (plurality opinion) (same). This is not to say that state law can answer the question for us by, for example, simply labeling as a state official an official who clearly makes county policy. But our understanding of the actual function of a governmental official, in a particular area, will necessarily be dependent on the definition of the official's functions under relevant state law. Cf. *Regents of University of California* v. *Doe*, 519 U. S. ___, ___ (slip. op., at 5, n. 5) ("[The] federal question can be answered only after considering the provisions of state law that define the agency's character").

The Court of Appeals for the Eleventh Circuit determined that under Alabama law, a sheriff acting in his law enforcement capacity is not a policymaker for the county. Since the jurisdiction of the Court of Appeals includes Alabama, we defer considerably to that court's expertise in interpreting Alabama law. [n.3] See *Jett, supra*, at 738 ("We think the Court of Appeals [for the Fifth Circuit], whose expertise in

*A5*

interpreting Texas law is greater than our own, is in a better position to determine whether [the school district superintendent] possessed final policymaking authority in the area of employee transfers"); *Pembaur, supra,* at 484, n. 13 ("We generally accord great deference to the interpretation and application of state law by the courts of appeals").

We begin with the Alabama Constitution, "the supreme law of the state." *Alexander* v. *State ex rel. Carver,* 150 So. 2d 204, 208 (1963). We agree with the Court of Appeals that the constitutional provisions concerning sheriffs, the historical development of those provisions, and the interpretation given them by the Alabama Supreme Court strongly support Monroe County's contention that sheriffs represent the State, at least for some purposes. Alabama's Constitution, adopted in 1901, states that "[t]he executive department shall consist of a governor, lieutenant governor, attorney general, state auditor, secretary of state, state treasurer, superintendent of education, commissioner of agriculture and industries, and a sheriff for each county." Ala. Const. of 1901, Art. V, §112. This designation is especially important for our purposes, because although every Alabama Constitution has included sheriffs as constitutional officers and has provided for their election by county voters, see Ala. Const. of 1819, Art. IV, §24; Ala. Const. of 1861, Art. IV, §24; Ala. Const. of 1865, Art. VII, §3; Ala. Const. of 1867, Art. V, §21; Ala. Const. of 1875, Art. V, §26; Ala. Const. of 1901, Art. V, §138, sheriffs have not always been explicitly listed as members of the state "executive department." Thus, the 1867 Constitution listed only the "governor, lieutenant governor, secretary of state, auditor, treasurer, and attorney general" as constituting "the executive department." Ala. Const. of 1867, Art. V, §1. This changed with the 1875 Constitution, when sheriffs and the Superintendent of Education were added to the list. Ala. Const. of 1875, Art. V, §1. [10, 11]

The framers of the 1901 Constitution took two significant steps in an attempt to solidify the place of sheriffs in the executive department, and to clarify that sheriffs were acting for the State when exercising their law enforcement functions. First, faced with reports that sheriffs were allowing mobs to abduct prisoners and lynch them, the framers made such "neglect" by sheriffs an impeachable offense. See Ala. Const. of 1901, Art. V, §138 ("Whenever any prisoner is taken from jail, or from the custody of any sheriff or his deputy, and put to death, or suffers grievous bodily harm, owing to the neglect, connivance, cowardice, or other grave fault of the sheriff, such sheriff may be impeached"); *State ex rel. Garber* v. *Cazalas,* 162 Ala. 210, 50 So. 296 (1909) (sheriff's failure to close jail doors, resulting in lynching of prisoner, constitutes impeachable offense); M. McMillan, Constitutional Development in Alabama, 1789-1901, p. 338, n. 186 (1955) (impeachment provision resulted in "much progress made against lynching").

Second, authority to impeach sheriffs was moved from the county courts to the State Supreme Court, because of "[t]he failure of county courts to punish sheriffs for neglect of duty." *Parker* v. *Amerson,* 519 So. 2d 442, 443 (Ala. 1987). One of the primary purposes of this change, proposed by ex Governor Thomas Goode Jones at the 1901 Convention, was "to augment the power of the Governor." *Id.,* at 444. After this change, the governor could order the State Supreme Court, rather than the county court, to begin impeachment proceedings against a wayward sheriff, and would not have to worry that local support for the sheriff would annul his effort at centralized control. See *ibid.*; Strengthening the Power of the Executive, Address of Emmet O'Neal, Governor of Alabama, 9-10 (Sept. 12, 1911) (new impeachment provision increases Governor's control of sheriffs and "gives the Executive real power which is respected and feared"). Thus, sheriffs now share the same impeachment procedures as state legal officers and lower state court judges. Ala. Const. of 1901, Art. VII, §174, rather than county and municipal officers, Ala. Const. of 1875, Art. VII, §3.

Critically for our case, the Alabama Supreme Court has interpreted these provisions and their historical background as evidence of "the framers' intent to ensure that sheriffs be considered executive officers of the state." *Parker*, 519 So. 2d. at 444. Based primarily on this understanding of the State Constitution, the court has held unequivocally that sheriffs are state officers, and that tort claims brought against sheriffs based on their officials acts therefore constitute suits against the State, not suits against the sheriff's county. *Id.,* at 443-445. [n.5] Thus, Alabama counties are not liable under a theory of *respondeat superior* for a sheriff's official acts that are tortious. *Id.,* at 442. The issues in *Parker* are strikingly similar to the ones in the present case, and that decision is therefore strong evidence in favor of the Court of Appeals' conclusion that sheriffs act on behalf of the State, rather than the county, when acting in their law enforcement capacity.

Turning from the Alabama Constitution to the Alabama Code, the relevant provisions are less compelling, but still support the conclusion of the Court of Appeals to some extent. Section 36-22-3 of the Code sets out a sheriff's duties. First, a sheriff must "attend upon" the state courts in his county, must "obey the lawful orders and directions" of those courts, and must "execute and return the process and orders" of any state court, even those outside his county. Ala. Code §§36-22-3(1), (2) (1991). Thus, judges (who are state officers, see Ala. Const. of 1901, Amdt. 328, §6.01) may order the sheriff to take certain actions, even if the judge sits in a distant county. And under Ala. Code §12-17-24 (1995), the presiding circuit judge "exercise[s] a general supervision" over the county sheriffs in his circuit, [n.6] just as if the sheriffs are normal "court [*i.e.,* state] employees" (see §12-17-1).

Second, the sheriff must give to the county treasurer a sworn written statement detailing the funds he has received for the county since his last statement, and must pay these funds to the treasurer. §36-22-3(3). In contrast to the state judges, however, the county treasurer does not appear to have any statutory authority to direct the sheriff to take specific actions.

Third and most importantly, "[i]t shall be the duty of sheriffs in their respective counties, by themselves or deputies, to ferret out crime, to apprehend and arrest criminals and, insofar as within their power, to secure evidence of crimes in their counties and to present a report of the evidence so secured to the district attorney or assistant district attorney for the county." §36-22-3(4). By this mandate, sheriffs are given complete authority to enforce the state criminal law in their counties. In contrast, the "powers and duties" of the counties themselves--creatures of the State who have only the powers granted to them by the State, *Alexander*, 150 So. 2d. at 206--do not include any provision in the area of law enforcement. Ala. Code §11-3-11 (1989). Thus, the "governing body" of the counties-- which in every Alabama county is the county commission, see *Calvert* v. *Cullman County Comm'n,* 669 So. 2d 119 (Ala. 1995) (citing §11-1-5)--cannot instruct the sheriff how to ferret out crime, how to arrest a criminal, or how to secure evidence of a crime. And when the sheriff does secure such evidence, he has an obligation to share this information not with the county commission, but with the district attorney (a state official, see *Hooks* v. *Hitt,* 539 So. 2d 157, 159 (Ala. 1988)).

While the county commission thus has no direct control over how the sheriff fulfills his law enforcement duty, the governor and the attorney general do have this kind of control. Pursuant to §36-22-5, they can direct the sheriff to investigate "any alleged violation of law in their counties." And after "proceed[ing] promptly" to complete this investigation, the sheriff must "promptly" write a report to the state official in charge of the investigation, stating his findings, listing the witnesses he has secured, and summarizing what the witnesses can prove. *Ibid.* In addition, the salaries of all sheriffs are set by the state legislature, not by the county commissions. §36-22-16.

SUPREME COURT OF THE UNITED STATES

No. 95-1100

# BOARD OF THE COUNTY COMMISSIONERS OF BRYAN COUNTY, OKLAHOMA, PETITIONER *v.* JILL BROWN et al.

## on writ of certiorari to the united states court of appeals for the fifth circuit

[April 28, 1997]

Justice O'Connor delivered the opinion of the Court.

Title 42 U.S.C. § 1983 provides in relevant part:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

We held in *Monell* v. *New York City Dept. of Social Servs.,* 436 U. S., at 689, that municipalities and other local governmental bodies are "persons" within the meaning of §1983. We also recognized that a municipality may not be held liable under §1983 solely because it employs a tortfeasor. Our conclusion rested partly on the language of §1983 itself. In light of the statute's imposition of liability on one who "subjects [a person], or causes [that person] to be subjected," to a deprivation of federal rights, we concluded that it "cannot be easily read to impose liability vicariously on governing bodies solely on the basis of the existence of an employer employee relationship with a tortfeasor." *Id.,* at 692. Our conclusion also rested upon the statute's legislative history. As stated in *Pembaur* v. *Cincinnati,* 475 U.S. 469, 479 (1986), "while Congress never questioned its power to impose civil liability on municipalities for their *own* illegal acts, Congress did doubt its constitutional power to impose such liability in order to oblige municipalities to control the conduct of *others*" (citing *Monell, supra,* at 665-683). We have consistently refused to hold municipalities liable under a theory of *respondeat superior.* See *Oklahoma City* v. *Tuttle,* 471 U.S. 808, 818 (1985) (plurality opinion); *id.,* at 828 (opinion of Brennan, J.); *Pembaur, supra,* at 478-479; *St. Louis* v. *Praprotnik,* 485 U.S. 112, 122 (1988) (plurality opinion); *id.,* at 137 (opinion of Brennan, J.); *Canton* v. *Harris,* 489 U.S. 378, 392 (1989).

Instead, in *Monell* and subsequent cases, we have required a plaintiff seeking to impose liability on a municipality under §1983 to identify a municipal "policy" or "custom" that caused the plaintiff's injury. See *Monell, supra,* at 694; *Pembaur, supra,* at 480-481; *Canton, supra,* at 389. Locating a "policy" ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality. *Monell, supra,* at 694. Similarly, an act performed pursuant to a "custom" that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law. 436 U. S., at 690-691 (citing *Adickes* v. *S. H. Kress & Co.,* 398 U.S. 144, 167-168 (1970)).

A8

The parties join issue on whether, under *Monell* and subsequent cases, a single hiring decision by a county sheriff can be a "policy" that triggers municipal liability. Relying on our decision in *Pembaur*, respondent claims that a single act by a decisionmaker with final authority in the relevant area constitutes a "policy" attributable to the municipality itself. So long as a §1983 plaintiff identifies a decision properly attributable to the municipality, respondent argues, there is no risk of imposing *respondeat superior* liability. Whether that decision was intended to govern only the situation at hand or to serve as a rule to be applied over time is immaterial. Rather, under respondent's theory, identification of an act of a proper municipal decisionmaker is all that is required to ensure that the municipality is held liable only for its own conduct. The Court of Appeals accepted respondent's approach.

As our §1983 municipal liability jurisprudence illustrates, however, it is not enough for a §1983 plaintiff merely to identify conduct properly attributable to the municipality. The plaintiff must also demonstrate that, through its *deliberate* conduct, the municipality was the "moving force" behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.

Where a plaintiff claims that a particular municipal action *itself* violates federal law, or directs an employee to do so, resolving these issues of fault and causation is straightforward. Section 1983 itself "contains no state of mind requirement independent of that necessary to state a 'violation'" of the underlying federal right. *Daniels* v. *Williams*, 474 U.S. 327, 330 (1986). In any §1983 suit, however, the plaintiff must establish the state of mind required to prove the underlying violation. Accordingly, proof that a municipality's legislative body or authorized decisionmaker has intentionally deprived a plaintiff of a federally protected right necessarily establishes that the municipality acted culpably. Similarly, the conclusion that the action taken or directed by the municipality or its authorized decisionmaker itself violates federal law will also determine that the municipal action was the moving force behind the injury of which the plaintiff complains.

No. 95-1100

## BOARD OF THE COUNTY COMMISSIONERS OF BRYAN COUNTY, OKLAHOMA, PETITIONER *v.* JILL BROWN et al.

### on writ of certiorari to the united states court of appeals for the fifth circuit

[April 28, 1997]

Justice Souter, with whom Justice Stevens and Justice Breyer join, dissenting.

In *Pembaur* v. *Cincinnati*, 475 U.S. 469, 480 (1986), we held a municipality liable under 42 U.S.C. § 1983 for harm caused by the single act of a policymaking officer in a matter within his authority but not covered by a policy previously identified. The central question presented here is whether that rule applies to a single act that itself neither violates nor commands a violation of federal law. The answer

A9

is yes if the single act amounts to deliberate indifference to a substantial risk that a violation of federal law will result. With significant qualifications, the Court assumes so, too, in theory, but it raises such skeptical hurdles to reaching any such conclusion in practice that it virtually guarantees its disposition of this case: it holds as a matter of law that the sheriff's act could not be thought to reflect deliberate indifference to the risk that his subordinate would violate the Constitution by using excessive force. I respectfully dissent as much from the level of the Court's skepticism as from its reversal of the judgment.

*Monell* v. *New York City Dept. of Social Servs.*, 436 U.S. 658 (1978), overruled *Monroe* v. *Pape*, 365 U.S. 167 (1961), insofar as *Monroe* had held §1983 inapplicable to governments beneath the state level ("municipal," for short). *Monell*, *supra*, at 663. At the same time that we decided Congress meant municipalities to be persons subject to §1983, however, we also concluded that municipal liability under the statute could not be based on the traditional theory of *respondeat superior*. 436 U. S., at 691. We said that for purposes of §1983 an act could not be attributed to a municipality merely because it was an act of a municipal agent performed in the course of exercising a power delegated to the municipality by local law, and we reasoned instead that "it is [only] when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under §1983." *Id.*, at 694; see *Pembaur*, *supra*, at 480.

In assigning municipal liability under *Monell*, we accordingly distinguish an act of a municipal agent without independent authority to establish policy from the act of one authorized to set policy under local law, and we likewise distinguish the acts of lower level employees depending on whether they do or do not implement or manifest a policy set by those with the authority to set it. The act of the municipality is the act only of an authorized policymaker or of an employee following the policymaker's lead. "The 'official policy' requirement was intended to distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible." *Pembaur*, *supra*, at 479-480.

While this overview indicates that the policy requirement may be satisfied in more than one way, there are in fact three alternatives discernible in our prior cases. It is certainly met when the appropriate officer or entity promulgates a generally applicable statement of policy and the subsequent act complained of is simply an implementation of that policy. *Monell* exemplified these circumstances, where city agencies had issued a rule requiring pregnant employees to take unpaid leaves of absence before any medical need arose. *Monell*, *supra*, at 660-661.

We have also held the policy requirement satisfied where no rule has been announced as "policy" but federal law has been violated by an act of the policymaker itself. In this situation, the choice of policy and its implementation are one, and the first or only action will suffice to ground municipal liability simply because it is the very policymaker who is acting. See *Pembaur*, *supra*, at 480-481; cf. *Newport* v. *Fact Concerts, Inc.*, 453 U.S. 247, 250-252 (1981) (implicitly assuming that a policymaker's single act can sustain §1983 action); *Owen* v. *Independence*, 445 U.S. 622, 625-630 (1980) (same). It does not matter that the policymaker may have chosen "a course of action tailored [only] to a particular situation and not intended to control decisions in later situations," *Pembaur*, 475 U. S., at 481; if the decision to adopt that particular course of action is intentionally made by the authorized policymaker, "it surely represents an act of official government 'policy' " and "the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly." *Ibid.*

A 10

We have, finally, identified a municipal policy in a third situation, even where the policymaker has failed to act affirmatively at all, so long as the need to take some action to control the agents of the Government "is so obvious, and the inadequacy [of existing practice] so likely to result in the violation of constitutional rights, that the policymake[r] . . . can reasonably be said to have been deliberately indifferent to the need." *Canton* v. *Harris,* 489 U.S. 378, 390 (1989). Where, in the most obvious example, the policymaker sits on his hands after repeated, unlawful acts of subordinate officers and that failure "evidences a 'deliberate indifference' to the rights of [the municipality's] inhabitants," *Id.,* at 389, the policymaker's toleration of the subordinates' behavior establishes a policy in practice just as readily attributable to the municipality as the one act policy in practice described above. Such a policy choice may be inferred even without a pattern of acts by subordinate officers, so long as the need for action by the policymaker is so obvious that the failure to act rises to deliberate indifference. *Id.,* at 390, n. 10.

Deliberate indifference is thus treated, as it is elsewhere in the law, [n.1] as tantamount to intent, so that inaction by a policymaker deliberately indifferent to a substantial risk of harm is equivalent to the intentional action that setting policy presupposes. Compare *Pembaur, supra,* at 483 (plurality opinion of Brennan, J.) ("deliberate choice" by policymaker) and *Oklahoma City v. Tuttle,* 471 U.S. 808, 823 (1985) (plurality opinion of Rehnquist, J.) ("'policy' generally implies a course of action consciously chosen") with *Canton, supra,* at 389 ("Only where a municipality's failure to train its employees . . . evidences a 'deliberate indifference' to the rights of its inhabitants can . . . a shortcoming be . . . city 'policy or custom' . . . actionable under §1985").

FOOTNOTE

1 See, *e.g.,* American Law Institute, Model Penal Code §2.02(2)(c) (1985) ("A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct."); *J. I. Case Credit Corp.* v. *First Nat. Bank of Madison Cty.* 991 F. 2d 1272, 1278 (CA7 1993) ("To consciously ignore or to deliberately close one's eyes to a manifest danger is recklessness, a mental state that the law commonly substitutes for intent or actual knowledge."). Cf. *Estelle* v. *Gamble,* 429 U.S. 97, 105-106 (1976) (deliberate indifference to a prisoner's serious medical needs violates the Eighth Amendment); *United States* v. *Giovannetti,* 919 F. 2d 1223, 1228 (CA7 1990) (a "deliberate effort to avoid guilty knowledge is all the guilty knowledge the law requires"); *United States* v. *Jewell,* 532 F. 2d 697, 700 (CA9), cert. denied, 426 U.S. 951 (1976) ("[D]eliberate ignorance and positive knowledge are equally culpable").

A 11

## *U.S. Supreme Court Reports*

## PIERSON v. RAY, 386 U.S. 547 (1967)

**386 U.S. 547**

**PIERSON ET AL. v. RAY ET AL.**
**CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT.**
**No. 79.**
**Argued January 11, 1967.**
**Decided April 11, 1967.[*]**

[Footnote *] Together with No. 94, Ray et al. v. Pierson et al., also on certiorari to the same court.

Petitioners,Fn members of a group of white and Negro clergymen on a " prayer pilgrimage" to promote racial integration, attempted to use a segregated interstate bus terminal waiting room in Jackson, Mississippi, in 1961. They were arrested by respondent policemen and charged with conduct breaching the peace in violation of 2087.5 of the Mississippi Code which this Court, in 1965, held unconstitutional in Thomas v. Mississippi, 380 U.S. 524, as applied to similar facts. Petitioners waived a jury trial and were convicted by respondent municipal police justice. On appeal one petitioner was accorded a trial de novo and, following a directed verdict in his favor, the cases against the other petitioners were dropped. Petitioners then brought this action in the District Court for damages (1) under 42 U.S.C. 1983, which makes liable " every person" who under color of law deprives another person of his civil rights, and (2) at common law for false arrest and imprisonment. The evidence showed that the ministers expected to be arrested on entering a segregated area. Though the witnesses agreed that petitioners entered the waiting room peacefully, petitioners testified that there was no crowd at the terminal, whereas the police testified that a threatening crowd followed petitioners. The jury found for respondents. On appeal the Court of Appeal held that (1) respondent police justice had immunity for his judicial acts under both 1983 and the state common law and (2) the policemen had immunity under the state common law of false arrest if they had probable cause to believe 2087.5 valid since they were not required to predict what laws are constitutional, but that, by virtue of Monroe v. Pape, 365 U.S. 167, they had no such immunity under 1983 where the state statute was subsequently declared invalid. The court remanded the case against the officers for a new trial under 1983 because of prejudicial cross-examination of petitioners, but ruled that they

Page 386 U.S. 547, 548

could not recover if it were shown at the new trial that they had gone to Mississippi in anticipation that they would be illegally arrested. Held:

> 1. The settled common-law principle that a judge is immune from liability for damages for his judicial acts was not abolished by 1983. Cf. Tenney v. Brandhove, 341 U.S. 367. Pp. 553-555.

# SUPREME COURT OF THE UNITED STATES

No. 90-985

JAYNE BRAY, et al., PETITIONERS *v.* ALEXANDRIA WOMEN'S HEALTH CLINIC et al.

on writ of certiorari to the united states court of
appeals for the fourth circuit

[January 13, 1993]

Justice Scalia delivered the opinion of the Court.

Our precedents establish that in order to prove a private conspiracy in violation of the first clause of § 1985(3), [n.1] a plaintiff must show, *inter alia*, (1) that-some racial, or perhaps otherwise class based, invidiously discriminatory animus [lay] behind the conspirators' action." *Griffin* v. *Breckenridge*, 403 U.S. 88, 102 (1971), and (2) that the conspiracy "aimed at interfering with rights" that are "protected against private, as well as official, encroachment." *Carpenters* v. *Scott*, 463 U.S. 825, 833 (1983). We think neither showing has been made in the present case.

In *Griffin* this Court held, reversing a 20 year old precedent, see *Collins* v. *Hardyman*, 341 U.S. 651 (1951), that § 1985(3) reaches not only conspiracies under color of state law, but also purely private conspiracies. In finding that the text required that expanded scope, however, we recognized the "constitutional shoals that would lie in the path of interpreting § 1985(3) as a general federal tort law." *Griffin*, 403 U. S., at 102. That was to be avoided, we said, "by requiring, as an element of the cause of action, the kind of invidiously discriminatory motivation stressed by the sponsors of the limiting amendment," *ibid.*--citing specifically Representative Shellabarger's statement that the law was restricted " `to the prevention of deprivations which shall attack the equality of rights of American citizens; that any violation of the right, the *animus* and effect of which is to strike down the citizen, to the end that he may not enjoy equality of rights as contrasted with his and other citizens' rights, shall be within the scope of the remedies . . . .' " *Id.*, at 100 (emphasis in original), quoting Cong. Globe, 42d Cong., 1st Sess., App. 478 (1871). We said that "[t]he language [of § 1985(3)] requiring intent to deprive of *equal* protection, or *equal* privileges and immunities, means that there must be some racial, or perhaps otherwise class based, invidiously discriminatory animus behind theconspirators' action." 403 U. S., at 102 (emphasis in original).

We have not yet had occasion to resolve the "perhaps": only in *Griffin* itself have we addressed and upheld a claim under § 1985(3), and that case involved race discrimination. Respondents assert that there qualifies alongside race discrimination, as an "otherwise class based, invidiously discriminatory animus" covered by the 1871 law, opposition to abortion. Neither common sense nor our precedents support this.

Justice Stevens

The Court bypasses the statute's history, intent, and plain language in its misplaced reliance on prior precedent. Of course, the Court has never before had occasion to construe the second clause of §1985(3). The first clause, however, has been narrowly construed in *Collins* v. *Hardyman*, 341 U.S. 651 (1951), *Griffin* v. *Breckenridge*, 403 U.S. 88 (1971), and *Carpenters* v. *Scott*, 463 U.S. 825 (1983). In the first of these decisions, the Court held that §1985(3) did not apply to wholly private conspiracies. [n.12] In *Griffin* the Court rejected that view but limited the application of the statute's first clause to conspiracies motivated by discriminatory intent to deprive plaintiffs of rights constitutionally protected against private (and not just governmental) deprivation. Finally, *Carpenters* re emphasized that the first clause of §1985(3) offers no relief from the violation of rights protected against only state interference. 463 U. S., at 830-834. To date, the Court has recognized as rights protected against private encroachment (and, hence, by §1985(3)) only the constitutional right of interstate travel and rights granted by the Thirteenth Amendment.

Once concerns about the constitutionality of §1985(3) are properly put aside, we can focus more appropriately on giving the statute its intended effect. On the facts disclosed by this record, I am convinced that both the text of the statute and its underlying purpose support the conclusion that petitioners' conspiracy was motivated by a discriminatory animus and violated respondents' protected right to engage in interstate travel.

The question left open in *Griffin*--whether the coverage of §1985(3) is limited to cases involving racial bias--is easily answered. The text of the statute provides no basis for excluding from its coverage any cognizable class of persons who are entitled to the equal protection of the laws. This Court has repeatedly and consistently held that gender based classifications are subject to challenge on constitutional grounds. see, *e. g.*, *Reed* v. *Reed*, 404 U.S. 71 (1971); *Mississippi University for Women* v. *Hogan*, 458 U.S. 718 (1982). A parallel construction of post-Civil War legislation that, in the words of Justice Holmes, "dealt with Federal rights and with all Federal rights, and protected them in the lump," *United States* v. *Mosley*, 238 U.S. 383, 387 (1915), is obviously appropriate.

The legislative history of the Act confirms the conclusion that even though it was primarily motivated by the lawless conduct directed at the recently emancipated citizens, its protection extended to "all the thirty eight millions of the citizens of this nation." Cong. Globe, 42d Cong., 1st Sess., 484 (1871). Given then prevailing attitudes about the respective roles of males and females in society, it is possible that the enacting legislators did not anticipate protection of women against class based discrimination. That, however, is not a sufficient reason for refusing to construe the statutory text in accord with its plain meaning, particularly when that construction fulfills the centralpurpose of the legislation. See *Union Bank* v. *Wolas*, 502 U. S. ___, ___ (1991) (slip op., at 4).

The gloss that Justice Stewart placed on the statute in *Griffin*, then, did not exclude gender based discrimination from its coverage. But it does require us to resolve the question whether a conspiracy animated by the desire to deprive women of their right to obtain an abortion is "class based."

HEIGHTENED PLEADING STANDARD

A 14

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

_____

No. 03-14387

_____

D. C. Docket No. 03-00011-CV-AR-S
TERRY LEE PASSMORE SWANN,
as Administrator of the Estate of
Merri Elizabeth Passmore,
Plaintiff-Appellant,
versus
SOUTHERN HEALTH PARTNERS, INC.,
Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

( October 21, 2004 )
Before BIRCH, BARKETT and COX, Circuit Judges.
COX, Circuit Judge:
The Plaintiff, Terry Lee Passmore Swann ("Swann"), executor of the estate of
Merri Elizabeth Passmore, appeals the district court's judgment for the Defendant,
2
Southern Health Partners, Inc. ("SHP"). The court granted the Defendant's motion
to dismiss the Plaintiff's second amended complaint for failure to satisfy the
heightened pleading standard applicable to claims brought under 42 U.S.C. § 1983
(1988). Because we conclude that the heightened pleading standard is not
applicable
in a § 1983 action against a non-governmental entity that cannot raise qualified
immunity as a defense, we reverse and remand for further proceedings.

**United States Court of Appeals**

**For the First Circuit**

No. 04-1792

CLARA ESTADES-NEGRONI,

*A 15*

Plaintiff, Appellant,

v.

CPC HOSPITAL SAN JUAN CAPESTRANO; DR. LUIS E. CANEPA, IN HIS PERSONAL
CAPACITY AND AS MEDICAL DIRECTOR OF FIRST OPTION CORPORATION PUERTO
RICO, A/K/A OPTIONS PUERTO RICO; FIRST OPTION CORPORATION PUERTO RICO,
A/K/A OPTIONS PUERTO RICO; DR. DOMINGO CORDERO; DR. BOGART ESPARZA;
DR. VILMA PAGAN; DR. MANUEL RODRIGUEZ; DR. FELIX MALDONADO,

Defendants, Appellees,

JOHN DOE 99CV1469; JANE DOE 99CV1469; JIM ROE 99CV1469,

Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. José Antonio Fusté, U.S. District Judge]

### II. Discussion

We review the district court's dismissal of Estades' § 1983 claim de novo. Rockwell, 26 F.3d at
255.

Section 1983 "provides a remedy for deprivations of rights secured by the Constitution and laws
of the United States when that deprivation takes place 'under color of any statute, ordinance,
regulation, custom, or usage, of any State . . . .'" Lugar v. Edmondson Oil Co., 457 U.S. 922, 924
(1982) (quoting § 1983). Therefore, a plaintiff claiming a § 1983 violation must allege that a
person or persons acting under color of state law[9] deprived him of a federal constitutional or
statutory right. See Rockwell, 26 F.3d at 256. If the plaintiff fails to allege facts sufficient to
establish either the deprivation of a federal right or that the defendant or defendants acted under
color of state law, then the § 1983 claim is subject to dismissal.

Here, there is no dispute that Estades, in asserting that she was involuntarily committed, alleged
the deprivation of a federal right. See, e.g., Harvey v. Harvey, 949 F.2d 1127, 1130 (11th Cir.
1992) (holding that an individual who is involuntarily committed is deprived of his constitutional
right to liberty). The disagreement is over whether she alleged facts sufficient to establish that
Appellees, private individuals and entities, acted under color of state law when they participated
in her involuntary commitment. For Appellees to have acted under color of state law, their

A16

actions must be "fairly attributable to the State." Lugar, 457 U.S. at 937. In other words, it must be fair to characterize them as state actors. See id.[16]

# U.S. 11th Circuit Court of Appeals

## UBOH v RENO

United States Court of Appeals,
Eleventh Circuit.
No. 95-8557.
George N. UBOH, Plaintiff-Appellant,
II. DISCUSSION

We independently review the district court's ruling concerning the applicable statute of limitations. Byrd v. MacPapers, Inc., 961 F.2d 157, 159 (11th Cir.1992). Federal courts apply their forum state's statute of limitations for personal injury actions to actions brought pursuant to 42 U.S.C. § 1983; similarly, we have held that the application of the state personal injury statute of limitations period obtains in the context of Bivens actions as well. See Kelly v. Serna, 87 F.3d 1235, 1238 (11th Cir.1996). It is undisputed in this case that Georgia's two-year personal injury statute of limitations applies to Uboh's constitutional claims.

A statute of limitations begins to run when the cause of action accrues. Id. The question of when the limitations period begins to run, however, is one of federal law. See Wilson v. Garcia, 471 U.S. 261, 268-71 , 105 S.Ct. 1938, 1942-44, 85 L.Ed.2d 254 (1985). Here, the district court construed Uboh's claim of malicious prosecution solely as a state law cause of action and noted that "the plaintiff ignores that [sic] fact that he is not suing the defendants for violation of any state law; indeed, Bivens creates a cause of action only for a violation of federally created rights." R1-20 at 3. The district court went on to find that the plaintiff had failed to show that he was unaware of the alleged injury caused by the wiretaps, the indictment, and the denial of bond at the time those events transpired. Consequently, because even the last of those events occurred more than two years prior to the filing of this action, the suit was barred by the statute of limitations. See id.

In the first instance, the district court erred in failing to recognize in Uboh's complaint the assertion of an established, federally-protected constitutional right. Indeed, there has been a remarkable divergence of opinion among the circuit courts as to both the extent to which the claim of malicious prosecution gives rise to a federal cause of action and, assuming that such a claim is cognizable, its constitutional source. Our court, however, unequivocally has identified malicious prosecution to be a constitutional tort that is cognizable under § 1983.[4] In Whiting v. Traylor, 85 F.3d 581 (11th Cir.1996), for instance, we observed that

[l]abeling ... a section 1983 claim as one for a "malicious prosecution" can be a shorthand way of describing a kind of legitimate section 1983 claim; the kind of claim where the plaintiff, as part of the commencement of a criminal proceeding, has been unlawfully and forcibly restrained in violation of the Fourth Amendment and injuries, due to that seizure, follow as the prosecution goes ahead.

A17

III. CONCLUSION

Uboh asks that we set aside the district court's decision to dismiss this cause of action based on the statute of limitations. In evaluating the propriety of the district court's order, we must decide whether a dismissal of some portions of an indictment following a defendant's conviction on other charges contained in the same indictment constitutes "favorable termination" for purposes of a subsequent *Bivens* action for malicious prosecution. We conclude that (1) the district court erred in failing to treat the complaint filed in this case as a claim for the constitutional tort of malicious prosecution under the Fourth Amendment; (2) Uboh's *pro se* complaint, which we are bound to construe liberally, does state a claim for malicious prosecution; (3) the prosecutor's dismissal of those charges in the indictment underlying the instant action did constitute termination in favor of the accused; (4) the cause of action stated by Uboh accrued at the time the drug charges were dismissed; and (5) regardless of the specific constitutional provision under which the complaint is construed. *Heck v. Humphrey* dictates that this action could not have been filed prior to the favorable resolution of the drug charges initially included in the indictment. This cause of action, therefore, is not barred by the statute of limitations and may proceed. Because the district court has not yet had an opportunity to address the defendants' claims regarding absolute and qualified immunity, we decline to consider the merits of those arguments and permit the district court to conduct the requisite factual and legal analysis in the first instance.

REVERSED and REMANDED for further proceedings consistent with this opinion.

**Snow v. Citronelle**

**III. DISCUSSION**

Although Snow brought claims under both the Eighth and Fourteenth Amendments, "the Eighth Amendment prohibitions against cruel and unusual punishment do not apply to pretrial detainees," like Poiroux. *Belcher v. City of Foley*, 30 F.3d 1390, 1396 (11th Cir. 1994) (quoting *Tittle v. Jefferson County Comm'n*, 10 F.3d 1535, 1539 n. 3 (11th Cir.1994)). The key issue in this appeal, therefore, is whether Snow alleged facts sufficient to withstand summary judgment on his claim that the defendants were deliberately indifferent to a strong likelihood that Poiroux would commit suicide while at the City of Citronelle jail in violation of the Fourteenth Amendment. Snow faces a difficult burden.

*C. The District Court Correctly Entered Summary Judgment*
*in Favor of the City and its Officials*
In addition, Snow sued the City of Citronelle and Parker, Reid, and Presnell in their official capacities. The district court properly granted summary judgment on these claims. "Because suits against a municipal officer sued in his official capacity and direct suits against municipalities are functionally equivalent," we address Snow's argument in relation to the City of Citronelle. *Busby v. City of Orlando*, 931 F.2d 764, 776 (11th Cir. 1991). A municipality may not be held liable under section 1983 on a theory of respondeat superior. *City of Canton v. Harris*, 489 U.S. 378, 385, 109 S. Ct. 1197, 1203, 103 L. Ed. 2d 412 (1989). "'It is only when the 'execution of the government's policy or custom... inflicts the injury' that the municipality may be held liable under [section] 1983.'" *Id.* (quoting *Springfield v. Kibbe*, 480 U.S. 257, 267, 107 S. Ct. 1114, 1119, 94 L. Ed. 2d 293 (1987) (O'Connor, J., dissenting) (quoting *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 694, 98 S. Ct. 2018, 2037-38, 56 L. Ed. 2d 611 (1978))). To hold the municipality liable, there must be "a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *Id.* at 385. Snow erroneously argues that the City of Citronelle should be liable because the failure of the city to have a suicide policy constituted deliberate indifference to a known, substantial risk of suicide. Although the jail did not have a written suicide policy, all of the

A 18

officers stated that an unwritten policy existed regarding suicidal detainees. Even assuming the absence of any suicide policy, however, the evidence does not establish a causal link between Poiroux's suicide and the alleged lack of a suicide policy at the City of Citronelle jail. The evidence is undisputed that Chennault, the only officer who may have had knowledge that Poiroux presented a strong likelihood of suicide, did not communicate that information to his colleagues. The officers on duty, therefore, would not have known to put Poiroux on a suicide watch even if there was a policy. Furthermore, Chennault stated that, had he suspected Poiroux was suicidal, he would have taken the actions a suicide policy would require: he would have told the dispatcher to check on Poiroux every fifteen minutes, removed items from the cell with which Poiroux could have harmed herself, and placed Poiroux in the drunk tank. Because the record shows that Chennault believed he should have taken these actions if a detainee was suicidal and Snow does not argue that the Constitution required Chennault to do more, his failure to do so cannot be attributed to the alleged lack of a suicide policy. Neither can the municipality be held liable for failure to train, failure to supervise, or inadequate staffing. Snow has not presented any evidence that Poiroux's suicide is attributable to any of these alleged failures. The municipality, therefore, cannot be held liable, and the district court correctly entered summary judgment.

## IV. CONCLUSION

**W**e reverse the summary judgment entered in favor of Chennault because there is an issue of fact regarding Chennault's subjective knowledge of a substantial likelihood that Poiroux would commit suicide. We affirm the summary judgment as to all remaining defendants, because Snow did not present any evidence that the remaining defendants had subjective knowledge of a substantial likelihood of a suicide attempt, and Poiroux's suicide cannot be attributed to a failure of the City of Citronelle to have a suicide policy. Finally, we vacate the dismissal of Snow's state law claims as to all defendants, except the City of Citronelle and Mayor Presnell, but express no opinion on the resolution of those claims.

# 652 Statute of Limitations for Conspiracy

Conspiracy is a continuing offense. For statutes such as 18 U.S.C. § 371, which require an overt act in furtherance of the conspiracy, the statute of limitations begins to run on the date of the last overt act. *See Fiswick v. United States*, 329 U.S. 211 (1946); *United States v. Butler*, 792 F.2d 1528 (11th Cir. 1986). For conspiracy statutes which do not require proof of an overt act, such as RICO (18 U.S.C. § 1961) or 21 U.S.C. § 846, the government must allege and prove that the conspiracy continued into the limitations period. The crucial question in this regard is the scope of the conspiratorial agreement, and the conspiracy is deemed to continue until its purpose has been achieved or abandoned. *See United States v. Northern Imp. Co.*, 814 F.2d 540 (8th Cir. 1987); *United States v. Coia*, 719 F.2d 1120 (11th Cir. 1983), *cert. denied*, 466 U.S. 973 (1984). An individual's "withdrawal" from a conspiracy starts the statute of limitations running as to that individual. "Withdrawal" from a conspiracy for this purpose means that the conspirator must take affirmative action by making a clean breast to the authorities or communicating his or her disassociation to the other conspirators. *See United States v. Gonzalez*, 797 F.2d 915 (10th Cir. 1986).

## TRAWINSKI V. UNITED TECHNOLOGIES  313 F.3d 1295 (11th Cir. 2002)

(This is contract claim and not civil rights conspiracy)  Therefore, the 2 year statute does not apply to McCarley.

A 19

Turning to the Trawinskis' § 1983(5) claim, the district court, following precedent, correctly found that the residual, two-year limitations period for personal injury actions provided by Ala. Code § 6-2-38(l) should apply. See Dumas v. Town of Mt. Vernon, Ala., 612 F.2d 974, 977 (5th Cir. 1980); Ingram v. Steven Robert Corp., 547 F.2d 1260, 1262-63 (5th Cir. 1977).[2] The facts and circumstances giving rise to the § 1985(3) claim were within the knowledge of the Trawinskis for more than two years before the filing of this action, and, accordingly, the district court correctly dismissed this claim as being time-barred.

## *Section 6-2-38*

## Commencement of actions - Two years.

(l) All actions for any injury to the person or rights of another not arising from contract and not specifically enumerated in this section must be brought within two years.

MCCARLEY ARGUES THE CRIMINAL CONSPIRACY STATUE SHOULD APPLY.

## JARALLAH V. SIMMONS

The Supreme Court has set forth a two-part test for determining when a judge is entitled to immunity from money damages liability when sued under
4
§ 1983. *Simmons v. Conger*, 86 F.3d 1080, 1084 (11th Cir. 1996). First, the judge must have dealt with the plaintiff in his judicial capacity. *Id*. "[W]hether an act by a judge is a judicial one relates to the nature of the act itself, *i.e.*, whether it is a function normally performed by a judge, and to the expectations of the parties, *i.e.*, whether they dealt with the judge in his judicial capacity." *Mireles v. Waco*, 112 S. Ct. 286, 288 (1991) (quotations and alteration omitted).
Second, the judge must
not have acted in the "clear absence of all jurisdiction." *Simmons*, 86 F.3d at 1085. "A judge will not be deprived of immunity because the action he took was in error, was done maliciously, or was in excess of his authority; rather, he will be subject to liability only when he has acted in the clear absence of all jurisdiction." *Stump v. Sparkman*, 98 S. Ct. 1099, 1105 (1978)

A20

SUPREME COURT OF THE UNITED STATES

No. 91-1657

## CHARLENE LEATHERMAN, et al., PETITIONERS *v.* TARRANT COUNTY NARCOTICS INTELLIGENCE AND COORDINATION UNIT et al.

**on writ of certiorari to the united states court of appeals for the fifth circuit**

[March 3, 1993]

Chief Justice Rehnquist delivered the opinion of the Court.

We granted certiorari to decide whether a federal court may apply a "heightened pleading standard"--more stringent than the usual pleading requirements of Rule 8(a) of the Federal Rules of Civil Procedure--in civil rights cases alleging municipal liability under Rev. Stat. § 1979, 42 U.S.C. § 1983. We hold it may not.

We review here a decision granting a motion to dismiss, and therefore must accept as true all the factual allegations in the complaint. See *United States* v. *Gaubert,* 499 U. S. ----, ---- (1991). This action arose out of two separate incidents involving the execution of search warrants by local law enforcement officers. Each involved the forcible entry into a home based on the detection of odors associated with the manufacture of narcotics. One homeowner claimed that he was assaulted by the officers after they had entered; another claimed that the police had entered her home in her absence and killed her two dogs. Plaintiffs sued several local officials in their official capacity and the county and two municipal corporations that employed the police officers involved in the incidents, asserting that the police conduct had violated the Fourth Amendment to the United States Constitution. The statedbasis for municipal liability under *Monell* v. *New York City Dept. of Social Services,* 436 U.S. 658 (1978), was the failure of these bodies adequately to train the police officers involved. See *Canton* v. *Harris,* 489 U.S. 378 (1989).

The United States District Court for the Northern District of Texas ordered the complaints dismissed, because they failed to meet the "heightened pleading standard" required by the decisional law of the Court of Appeals for the Fifth Circuit. 755 F. Supp. 726 (1991). The Fifth Circuit, in turn, affirmed the judgment of dismissal, 954 F. 2d 1054 (1992), and we granted certiorari, 505 U. S. ---- (1992), to resolve a conflict among the Courts of Appeals concerning the applicability of a heightened pleading standard to § 1983 actions alleging municipal liability. Compare, *e. g., Karim Panahi* v. *Los Angeles Police Dept.,* 839 F. 2d 621, 624 (CA9 1988) ("a claim of municipal liability under section 1983 is sufficient to withstand a motion to dismiss even if the claim is based on nothing more than a bare allegation that the individual officers' conduct conformed to official policy, custom, or practice") (internal quotation marks omitted). We now reverse.

A 21

Respondents seek to defend the Fifth Circuit's application of a more rigorous pleading standard on two grounds. [n.4] First, respondents claim that municipalities' freedom from *respondeat superior* liability, see *Monell, supra*, necessarily includes immunity from suit. In this sense, respondents assert, municipalities are no different from state or local officials sued in their individual capacity. Respondents reason that a more relaxed pleading requirement would subject municipalities to expensive and time consuming discovery in every § 1983 case, eviscerating their immunity from suit and disrupting municipal functions.

This argument wrongly equates freedom from liability with immunity from suit. To be sure, we reaffirmed in *Monell* that "a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." 436 U. S., at 691. But, contrary to respondents' assertions, this protection against liability does not encompass immunity from suit. Indeed, this argument is flatly contradicted by *Monell* and our later decisions involving municipal liability under § 1983. In *Monell*, we overruled *Monroe v. Pape*, 365 U.S. 167 (1961), insofar as it held that local governments were wholly immune from suit under § 1983, though we did reserve decision on whether municipalities are entitled to some form of limited immunity. 436 U. S., at 701. Yet, when we took that issue up again in *Owen v. City of Independence*, 445 U.S. 622, 650 (1980), we rejected a claim that municipalities should be afforded qualified immunity, much like that afforded individual officials, based on the good faith of their agents. These decisions make it quite clear that, unlike various government officials, municipalities do not enjoy immunity from suit--either absolute or qualified--under § 1983. In short, a municipality can be sued under § 1983, but it cannot be held liable unless a municipal policy or custom caused the constitutional injury. We thus have no occasion to consider whether our qualified immunity jurisprudence would require a heightened pleading in cases involving individual government officials.

Second, respondents contend that the Fifth Circuit's heightened pleading standard is not really that at all. See Brief for Respondents Tarrant County Narcotics Intelligence and Coordination Unit et al. 9-10 ("[T]he Fifth Circuit's so called 'heightened' pleading requirement is a misnomer"). According to respondents, the degree of factual specificity required of a complaint by the Federal Rules of Civil Procedure varies according to the complexity of the underlying substantive law. To establish municipal liability under § 1983, respondents argue, a plaintiff must do more than plead a single instance of misconduct. This requirement, respondents insist, is consistent with a plaintiff's Rule 11 obligation to make a reasonable pre-filing inquiry into the facts.

But examination of the Fifth Circuit's decision in this case makes it quite evident that the "heightened pleading standard" is just what it purports to be: a more demanding rule for pleading a complaint under § 1983 than for pleading other kinds of claims for relief. See 954 F. 2d, at 1057-1058. This rule was adopted by the Fifth Circuit in *Elliott v. Perez*, 751 F. 2d 1472 (1985), and described in this language:

"In cases against government officials involving the likely defense of immunity we require of trial judges that they demand that the plaintiff's complaints state with factual detail and particularity the basis for the claim which necessarily includes why the defendant official cannot successfully maintain the defense of immunity." *Id.*, at 1473.

A 22

In later cases, the Fifth Circuit extended this rule to complaints against municipal corporations asserting liability under § 1983. See, *e. g., Palmer* v. *San Antonio*, 810 F. 2d 514 (1987).

We think that it is impossible to square the "heightened pleading standard" applied by the Fifth Circuit in this case with the liberal system of "notice pleading" set up by the Federal Rules. Rule 8(a)(2) requires that a complaint include only "a short and plain statement of the claim showing that the pleader is entitled to relief." In *Conley* v. *Gibson*, 355 U.S. 41 (1957), we said in effect that the Rule meant what it said:

"[T]he Federal Rules of Civil Procedure do not require a claimant to set out in detail the facts upon which he bases his claim. To the contrary, all the Rules require is 'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Id.,* at 47 (footnote omitted).

Rule 9(b) does impose a particularity requirement in two specific instances. It provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Thus, the Federal Rules do address in Rule 9(b) the question of the need for greater particularity in pleading certain actions, but do not include among the enumerated actions any reference to complaints alleging municipal liability under § 1983. *Expressio unius est exclusio alterius.*

The phenomenon of litigation against municipal corporations based on claimed constitutional violations by their employees dates from our decision in *Monell, supra,* where we for the first time construed § 1983 to allow such municipal liability. Perhaps if Rules 8 and 9 were re written today, claims against municipalities under § 1983 might be subjected to the added specificity requirement of Rule 9(b). But that is a result which must be obtained by the process of amending the Federal Rules, and not by judicial interpretation. In the absence of such an amendment, federal courts and litigants must rely on summary judgment and control of discovery to weed out unmeritorious claims sooner rather than later.

The judgment of the Court of Appeals is reversed, and the case remanded for further proceedings consistent with this opinion.

*It is so ordered.*

## *Section 12-14-1*

**Establishment; jurisdiction.**

(a) There is hereby established, effective December 27, 1977, for each municipal corporation, hereinafter referred to in this chapter as "municipality," within the state, except those which elect not to have such courts by ordinance adopted before December 27, 1977, a municipal court subject to the authority, conditions and limitations provided by law.

(b) The municipal court shall have jurisdiction of all prosecutions for the breach of the ordinances of the municipality within its police jurisdiction.

A 23

(c) The municipal court shall have concurrent jurisdiction with the district court of all acts constituting violations of state law committed within the police jurisdiction of the municipality which may be prosecuted as breaches of municipal ordinances.

**(Acts 1975, No. 1205, p. 2384, §8-101.)**

Rule 9. Pleading Special Matters

**(a) Capacity.**

It is not necessary to aver the capacity of a party to sue or be sued or the authority of a party to sue or be sued in a representative capacity or the legal existence of an organized association of persons that is made a party, except to the extent required to show the jurisdiction of the court. When a party desires to raise an issue as to the legal existence of any party or the capacity of any party to sue or be sued or the authority of a party to sue or be sued in a representative capacity, the party desiring to raise the issue shall do so by specific negative averment, which shall include such supporting particulars as are peculiarly within the pleader's knowledge.

**(b) Fraud, Mistake, Condition of the Mind.**

In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.

A 24

# U.S. 11th Circuit Court of Appeals

## DOWNING v BD. OF TRUSTEES

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

No. 00-10481

D.C. Docket No. 98-02172 CV-AR-S

UNITED STATES OF AMERICA,  Intervenor.

Appeal from the United States District Court
for the Northern District of Alabama

**(February 13, 2003)**

Before TJOFLAT and BIRCH, Circuit Judges, an

We find our answer to the first question in <u>Cross v. State of Alabama</u>, 49 F.3d 1490 (11th Cir. 1995). In <u>Cross</u>, the plaintiffs, employees at an Alabama mental health hospital, sued the State and the officials in charge of the facility (in both their official and individual capacities) under Title VII and 42 U.S.C. § 1983, claiming that their supervisors had subjected them to "sexual harassment and a hostile work environment." <u>Id.</u> at 1501. This, they alleged, altered the conditions of their employment in violation of Title VII and deprived them of the equal protection of the laws. The plaintiffs sought injunctive relief, back pay, and damages, both compensatory and punitive. The case was tried to a jury, and the jury, in its answers to the court's special interrogatories,[6] found for the plaintiffs on all claims. Based on the jury's answers, the court awarded the plaintiffs back pay, compensatory damages for emotional distress, and punitive damages.[7]

The State and the officials appealed on several grounds, one of relevance here: that the evidence was insufficient to establish the plaintiffs' sexual harassment claims under Title VII and the Equal Protection Clause.[8] After acknowledging that the plaintiffs had a right under Title VII and the Equal Protection Clause to be free from sexual harassment at the hands of their employer, the court held that the evidence was sufficient to establish both claims. What is more, the court held that the elements of the equal protection and Title VII claims were identical.[9] Given this holding - that the elements of a sexual harassment claim are identical - it follows that Title VII did not create a new constitutional right. As the Seventh Circuit aptly observed in <u>Nanda</u>, "[a] review of the standards of the Equal Protection Clause and of Title VII reveals that Title VII 'enforces the Fourteenth Amendment without altering its meaning.'" 303 F.3d 817, 830 (7th Cir. 2002) (quoting <u>Cherry v. Univ. of Wis. Sys. Bd. of Regents</u>, 265 F.3d 541, 549 (7th Cir. 2001)).

For the foregoing reasons, the district court's order denying the Board Eleventh Amendment immunity is

AFFIRMED.

A25